# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **KYLE BLAKE GREENSPAN,** | Civil No.      12-cv-2402-AJB(BGS) |
| **Petitioner,** | |
| | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE DENIAL OF HABEAS PETITION** |
| **vs.** | |
| **MATTHEW CATE,  Secretary,** | |
| **Respondent.** | |

Kyle Blake Greenspan ("Greenspan"), a state prisoner proceeding with the assistance of counsel, seeks federal habeas corpus relief pursuant to 28 U.S.C. § 2254 from his July 29, 2008 convictions of forcible rape and sexual battery in San Diego County Superior Court Case No. SCD210048.  He has served a three year prison term imposed for those crimes and is currently under a five-year period of parole supervision. (Traverse 1, ECF No. 14.)[1]  He is required under California law to register as a sex offender as a result of those convictions.  The California Court of Appeal affirmed the judgment in an unpublished opinion, and his petition for review was summarily denied by the California Supreme Court.  His attempts to obtain collateral relief in the state courts were unsuccessful. Greenspan filed his federal Petition on October 3, 2012 ("Petition").  Respondent filed

---

[1]   Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing system.

an Answer opposing any relief.  Greenspan filed a Traverse.  In consideration of the record and controlling legal authority, it is recommended that the Petition be **DENIED**.

## I.    BACKGROUND

### A.    Factual Background

In its unpublished decision affirming the judgment, the California Court of Appeal summarized the facts of the case, observing:  "Because Greenspan does not challenge the sufficiency of the evidence to sustain his conviction, we summarily recite the operative facts in the light most favorable to the judgment."  (Lodg. No. 7 (Cal. Ct. App. Case No. D054840, Mar. 9, 2011), slip op. at 2 (citations omitted).)  On federal habeas review, a rebuttable presumption of correctness attaches to state appellate courts' factual statements. 28 U.S.C. §2254(e)(1); <u>Moses v. Payne</u>, 555 F.3d 742, 746, n.1 (9th Cir. 2009).  Greenspan does not dispute the accuracy of the court's summary.

> R.A. was 23 years old at the time of trial and testified that she had known Greenspan from grade school, but in the years afterwards they had only brief, sporadic interactions, including once in 2004, when they kissed in a friend's college dormitory. In June 2007, they renewed contact and exchanged text messages and phone calls. In the early morning of July 7, 2007, he accepted her invitation to her apartment to watch a movie with her and her friends.  He seemed drunk when he arrived and he drank a beer there.

> After the movie ended they went upstairs to her bedroom and sat on her bed reminiscing about grade school.  At one point he playfully pushed her chest such that she lay on the bed, but she immediately came back up.  He tried to kiss her but she turned her head.  While he was still fully clothed, he pushed her on the bed, pressed his weight on her, hooked one of his arms around her shoulder and, with his other forearm, pushed down on her lower stomach while he kept trying to kiss her.  He raped her.  He ejaculated on her shirt.  She ran to the bathroom, changed her shirt and ran downstairs crying.  At the time of the incident she was five feet three inches tall and weighed 130 pounds.

> R.A.'s crying woke up one of her roommates at approximately 3:30 a.m., and R.A told her Greenspan had raped her, and he was asleep on her bed.  The roommate told her to stay in the laundry room while she asked him to leave the house.  The roommate testified that he was lying on R.A.'s bed wearing only his boxer shorts.  She woke him up and repeatedly told him he needed to get dressed and leave.  He kept asking, "What did I do?"  She reiterated that he had to leave.  She walked him to the front porch and he asked her if R.A. thought he had raped her.  The roommate responded, "Okay, good. So you do know what you did. You need to leave."

> At approximately 4:00 a.m., while R.A. was still in the laundry room, she telephoned a girlfriend--who did not answer--so she telephoned that friend's boyfriend. He testified that R.A. was crying and sounded shaken up.  His girlfriend spoke to R.A. and they immediately went to R.A.'s apartment, where she was crying and appeared "traumatized."  They took her to the hospital, where she cried during an interview with a police officer.  In a sexual assault response team (SART) exam, a forensic nurse

examined her and determined that she had vaginal redness that was consistent with either consensual or nonconsensual sexual intercourse. The parties stipulated that tests done on R.A.'s shirt by the San Diego Police Department's Forensic Unit showed that sperm from the shirt matched Greenspan's DNA.

Greenspan was five feet eleven inches tall and weighed approximately 195 pounds at the time of the incident. He testified at trial that after the movie he and R.A. talked in her bedroom. According to Greenspan, his sex with R.A. was consensual, he was not wearing a condom and ejaculated on her chest. She wiped herself with her shirt. He was shocked that night when R.A.'s roommate woke him and told him he had to leave. He asked the roommate whether R.A. thought he had raped her, denied doing so, and asked to speak to R.A. The roommate refused that request. He felt sad that he was blamed for making R.A. cry, and he telephoned her as he was walking from her residence, but she did not answer.

The parties stipulated that approximately one week after the incident, a detective helped R.A. make a pretext telephone call to Greenspan. The jury heard a recording of the call, in which Greenspan repeatedly apologized to R.A., at one point stating, "I am so sorry, I know that you don't think that's good enough or I guess I took it the wrong way and I didn't know." R.A. told him he had raped her and he replied that he did not feel she had pushed him away. R.A. told him she needed to hear him say why he was sorry and he replied, "Because I guess I took advantage of you and I am sorry and I didn't mean to hurt you in any way in that way because, you know, I would never hurt you." He continued, "I have two older sisters, I would never ever do that."

(Lodg. No. 7, slip op. at 2-4.)

The defense theory was that the sexual encounter between Greenspan and R.A. was consensual. Defense counsel cross-examined R.A. in detail about their prior interactions and communications, up to and through R.A.'s invitation that Greenspan come to her apartment where she, her roommates, and friends were hanging out. Counsel emphasized several discrepancies between R.A.'s preliminary hearing testimony and her trial testimony. (*See* Lodg. No. 2, RT vol. 2 at 289-335.)

Greenspan testified on his own behalf. (Lodg. No. 2, RT vol. 2 at 392- 423.) Consistently with other testimony, Greenspan testified he knew R.A. from fifth through eighth grade when they attended the same school. They retained mutual friends but attended different high schools. They had an encounter in 2004 on the San Diego State campus -- although in his account, the extent of their physical contact on that occasion was much more extensive than the one kiss R.A testified they had exchanged at that time. Greenspan subsequently moved out of California, then returned in 2007. He described the social media and telephone contact he had with R.A. beginning a couple of months before the incident. (Lodg. No. 2, RT vol. 2 at 394-408.) His description of how he ended up at R.A.'s

apartment essentially coincided with R.A's description. However, Greenspan's description of what happened after they had gone upstairs together in the early morning hours differed irreconcilably from R.A.'s testimony in such crucial respects as who instigated their sexual encounter and the extent, nature, and duration of that contact. (Id. at 408-423, 452-457.)

## B. **Procedural Background**

The charged rape (Cal. Penal Code § 261(a)(2)) and sexual battery (Cal. Penal Code § 243.4(a)) crimes occurred on July 7, 2007. (Lodg. No 1, Clerk's Transcript ("CT") at 0001-0002.) Trial began on July 23, 2008, with a jury sworn by the end of that day. Counsel made their opening statements and the presentation of evidence began the next day. (Id. CT vol. 2 at 0283-0286.) Both sides rested after just over two days of trial. (Id. at 0285-0292.) The jury deliberated about two hours before returning guilty verdicts on both charges. (Id. at 0294-0296.)

On August 25, 2008, the court convened the sentencing hearing. Defense counsel presented a motion to dismiss and, in the alternative, a motion for a continuance of the sentencing to permit additional forensic investigation into potential grounds for a new trial motion. The court denied the dismissal motion but granted a 60-day sentencing continuance. (Lodg. No. 2, RT vol. 3 at 650-658.) On November 20, 2008, the court reconvened the sentencing hearing and acknowledged a pending motion for new trial. By that time, Greenspan was represented by new counsel. He had replaced trial counsel, Bradley C. Patton, with substitute retained counsel Catherine Denevi on October 20, 2008. (Lodg. No. 1, CT vol. 2 at 265.) New counsel moved to compel disclosure of juror identification information in order to investigate alleged misconduct. (Lodg. No. 2, RT vol. 4 at 660-661.) After hearing extensive argument, the court denied that motion, finding that there was no new information and that the issue had been previously reviewed and "fully discussed" with prior counsel on the record. (Id. at 661-667.) The court continued consideration of the new trial motion and the sentencing date.

At the February 25, 2009 hearing of the new trial motion, alleging instances of legal error, juror misconduct, and evidentiary challenges to the verdict (Lodg. No. 1, CT vol. 2 at 174-219), the court accepted as true all the affidavit representations of defense counsel's experts and private investigator, obviating the need to receive their testimony at an evidentiary hearing. The court also accepted counsel's representations about what other witnesses would say. (Lodg. No. 2, RT vol. 5 at

670-682.)  Before denying the motion, the court systematically addressed each of the motion grounds presented and the multiple exhibits, assessed each ground and the significance or insignificance of each item of evidence, and evaluated the credibility of the witnesses and strength of the trial evidence, concluding with the observation:  "[W]hile I think this is a very sad case, I don't think it is a miscarriage of justice."  (Lodg. No. 2, RT vol. 5 at 682, 685:  "I agree with probation, I probably would have put him on probation if that had been an option in this case.")  Sentencing  in conformity with the probation report's recommendation immediately followed.  The court imposed the lower term of three years on count one and the lower term of two years on count two, with the latter sentence stayed, for a total prison term of three years, plus payment of restitution, followed by a period of parole. (Lodg. No. 2, RT vol. 5 at 685-687.)  The court further ordered that after his release, Greenspan would be required to register as a sex offender pursuant to Cal. Penal Code § 290.[2]  (Id. at 687.)

Greenspan appealed his conviction.  He alleged trial error in three particulars related to the court's handling of a juror's note, potential juror misconduct, and the giving of one jury instruction. (Lodg. No. 4 (Cal.  Ct. App. Case No. D054840), Opening Brief.)  In February 2010, while his direct appeal remained pending, his attorney also filed a petition for writ of habeas corpus in the California Court of Appeal.  (Lodg. Nos. 12, 13, Case No. D056822.)  In that petition, Greenspan alleged ineffective assistance of trial counsel for failure to accurately convey a pre-trial offer, failure to investigate and present impeachment evidence in the form of R.A.'s conduct as depicted on a videotape, and failure to present character witnesses favorable to him.  (Lodg. No. 12, Petition at i-ii.) The petition was accompanied by a request that the court consolidate the habeas petition with the direct appeal.  A March 24, 2010 docket entry in the habeas case states:  "The petition for writ of habeas corpus In re Greenspan, No. D056822, will be considered at the same time as the pending appeal People v. Greenspan, No. D054840."  (Lodg. No. 13.)

The next docket entry in Greenspan's habeas case, dated June 25, 2010, memorializes the

---

[2]  California's Sex Offender Registration Act requires certain convicted sex offenders to register with law enforcement officials in the communities in which they reside. Cal. Penal Code §§ 290(c) (a section which enumerates various sex offenses under California law), 290.005(a). California's Sexual Predator Punishment and Control Act of 2006—also known as Jessica's Law or Proposition 83—imposes several requirements that apply to parolees who, as sex offenders, are subject to that duty to register.

appellate court's order to show cause why the relief sought in the petition should not be granted and instructing, in pertinent part, that "the order to show cause is made returnable before the superior court," authorizing the People, "[i]n addition to the briefing previously filed . . . [to] file a return to the order to show cause," authorizing Greenspan to "file a traverse, both of which shall be filed in the superior court," and directing the superior court "to hear and determine the matter." (Lodg. No. 13, Docket in Case No. D056822 at 1.) That additional briefing is provided here as Lodgment Nos. 14 and 15. The referral and the disposition of Greenspan's habeas petition concluded as described in a November 4, 2010 docket entry in Case No. D056822:

> On June 25, 2010, this court issued an order to show cause returnable in superior court in this matter and directed the superior court to notify this court in writing of its determination. The superior court issued an order denying the petition for writ of habeas corpus on October 18, 2010. . . . On November 1, 2010, petitioner filed a "Motion for Limited Remand to the Superior Court with Directions to Conduct an Evidentiary Hearing in Compliance with the Order to Show Cause issued June 25, 2010, and to Order the Writ in this Case to be Returnable to This Court." This court no longer has jurisdiction in this matter and will not act on the motion filed on November 1, 2010.

(Lodg. No. 13 at 2.)

The October 18, 2010 reasoned decision from the superior court denying Greenspan habeas relief reached and rejected on the merits each of the three instances of ineffective assistance of trial counsel Greenspan had alleged, adding: "Because of the discussion and decision set forth below, this Superior Court has determined that there is no need for an evidentiary hearing because the issues presented are resolved."[3] (Lodg. No. 16 at 2 (Cal. Superior Court, Case No. HC20063, Oct. 18, 2010), Order Denying Petition for Writ of Habeas Corpus).)

In a reasoned decision filed March 9, 2011, the appellate court decided Greenspan's direct appeal on the merits, affirming the judgment and denying him relief on any of his alleged trial errors. (Lodg. No. 7, slip op.) Greenspan presents no jury-related ground for relief here. In his April 19,

---

[3] Greenspan also complains of purported state law procedural defects in the process used by the state superior court in deciding his habeas petition after referral from the court of appeal. The superior court elected not to hold an evidentiary hearing, observing that it had ample evidence in the form of multiple sworn declarations that made an evidentiary hearing unnecessary. Although Greenspan cites Hicks v. Oklahoma, 447 U.S. 343, 346 (1980) for the proposition that the "California Courts [failed] to follow their own procedure and denied Mr. Greenspan Due Process of Law, in violation of the Fourteenth Amendment" in this regard (Traverse 2, ECF 14; Traverse 3, ECF 14-2), the Hicks case decided an inapposite question associated with jury instruction error affecting the imposition of criminal punishment. The state law evidentiary hearing procedure and state court decision at issue in Greenspan's case raise no federal constitutional concern.

6

2011 Petition For Review to the California Supreme Court, Greenspan presented only one issue: "Whether the Court of Appeal erred in affirming the exclusion under Evidence Code §§ 352 and 782, [of] photos of the complainant in a rape prosecution posted on her Facebook page showing her partying in Las Vegas days after she claimed she had been raped?" (Lodg. No. 8, Petition For Review at 1-2.) By docket entry dated June 8, 2011, the California Supreme Court summarily denied the petition. (Lodg. No. 9 (Cal. Supreme Ct, Case No. S192405, Jun. 8, 2011).) Greenspan sought relief from the United States Supreme Court in a Petition For Writ Of Certiorari to challenge the California Court of Appeal's application of the state's "rape shield" law in denying him "the right to confront and cross-examine the complainant with conduct that directly contradicted her testimony at trial that her encounter with the petitioner [was] traumatic and by inference non-consensual." (Lodg. No. 10, Petition For Writ Of Certiorari at i.) The Supreme Court summarily denied certiorari on October 3, 2011. (Lodg. No. 11, <u>Greenspan v. California</u>, 132 S.Ct. 277, 80 USLW 3188.)

Greenspan also presented his various instances of alleged ineffective assistance of trial counsel in a habeas petition to the California Supreme Court in October 2011. (Lodg. No. 17.) That court summarily denied the habeas petition on December 12, 2012. (Lodg. No. 18 (Cal. Supreme Ct., Case No. S205815, Dec. 12, 2012).)

Greenspan's October 3, 2012 federal Petition, filed before his habeas petition to the state's highest court was decided, presents two grounds for relief. Ground One alleges he was denied his "right to confront and cross-examine the complaining witness, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, by the trial court's ruling" excluding certain Facebook photos from the victim's Las Vegas trip a few days after the incident. (Pet 5, ECF No. 1.) Ground Two alleges ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendment for three alleged performance deficiencies: (1) failure to convey a pre-trial plea offer; (2) failure to investigate and present evidence of the victim's conduct captured on videotape; and (3) failure to interview and present character witnesses on Greenspan's behalf.[4] (<u>Id.</u> at 7.) The Petition was

---

[4] Greenspan's Traverse introduces a claim heading not identified as a discrete ground for relief in his Petition: "The California Court of Appeal's rejection of the claim of prosecutorial misconduct was an unreasonable determination of the facts in light of the evidence in the case." (Traverse 24, ECF No. 14-2.) That contention suggests a variation on his IAC claim for alleged failure to convey a plea offer. However, among other things, he cites no federal authority controlling the issue of prosecutorial misconduct he contends is

12cv2402-AJB(BGS)

accompanied by a Motion for Stay and Abeyance to exhaust his IAC claims because his habeas petition in the California Supreme Court remained pending. That Motion was denied as moot in a January 24, 2013 Order, by which time the state high court had denied Greenspan's habeas petition. (ECF No. 6.) Respondent concedes that all the Petition claims are exhausted. (Ans. 2, ECF No. 10.)

## II.     DISCUSSION

### A.     Legal Standards For Federal Habeas Relief

"[H]abeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. __, 131 S.Ct. 770, 786 (2011), *quoting* Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring). A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States."[5] 28 U.S.C. § 2254(a). Federal habeas courts may not "reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 68 (1991); *see* Bradshaw v. Richey, 546 U.S. 74, 76, (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus").

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs review of Greenspan's claims because he filed his federal habeas petition after that statute's 1996 effective date. Lindh v. Murphy, 521 U.S. 320, 322-23 (1997). AEDPA imposes a " 'highly deferential standard for evaluating state-court rulings,' " requiring "that state-court decisions be given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24 (2002), *quoting* Lindh, 521 U.S. at 333 n.7. "AEDPA prevents defendants -- and federal courts -- from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 130 S.Ct. 1855, 1866

contravened by the state court result rejecting his plea offer challenges, he did not identify in his Petition any specific instance of prosecutorial misconduct in a manner that would have permitted Respondent to address the issue as such in its Answer, the state courts found, in connection with resolving his IAC claims, that the prosecutor never made the plea offer Greenspan describes, and there is no evidence that he exhausted any allegation of prosecutorial misconduct in this or in any other regard. Accordingly, the Court deems it to be a new and inchoate claim and does not address that theory here.

[5] A state parolee is "in custody" for purposes of the federal habeas statute. Jones v. Cunningham, 371 U.S. 236, 243 (1963).

(2010). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there

 was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Richter, 131 S.Ct. at 786-87.

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)."  Richter, 131 S.Ct. at 784.  Federal habeas relief is available under the first exception if the state court result "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); *see* Lockyer v. Andrade, 538 U.S. 63, 73-76 (2003); *see also* Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (distinguishing the 28 U.S.C. § 2254(d)(1) "contrary to" test from its "unreasonable application" test).  To be found an "unreasonable application" of the precedent, the state court decision must have been "more than incorrect or erroneous;" it "must have been 'objectively unreasonable.' "  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003) (citations omitted); Renico, 130 S.Ct. at 1866.  A lack of holdings from the Supreme Court on the issue presented precludes relief under 28 U.S.C. § 2254(d)(1).  Carey v. Musladin, 549 U.S. 70, 77 (2006); *see* Moses, 555 F.3d at 754 ("[W]hen a Supreme Court decision does not 'squarely address[]' the issue in the case it cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue," and a federal habeas court "must defer to the state court's decision"), *citing, inter alia*, Wright v. Van Patten, 552 U.S. 120, 123 (2008).  Section "2254(d) mandates that only Supreme Court precedential holdings clearly establish a right, [but] our circuit precedent may provide persuasive authority for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent."  Mendez v. Knowles, 556 F.3d 757, 767 (9th Cir. 2009).

Under the second AEDPA exception, relief is available only if the state court based its result "on an unreasonable determination of the facts in light of the evidence . . . ."  28 U.S.C. § 2254(d)(2); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual

grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)").  The question "is not whether a federal court believes the state court's \\

determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

Federal habeas courts reviewing prisoners' claims under 28 U.S.C. § 2254 "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in" Brecht v. Abrahamson, 507 U.S. 619 (1993).  Fry v. Pliler, 551 U.S. 112, 121 (2007); see Baines v. Cambra, 204 F.3d 964, 977 (9th Cir. 2000) (the Ninth Circuit applies the Brecht harmless error standard "uniformly in all federal habeas cases under § 2254").  Thus, even if constitutional error occurred, the petitioner must still demonstrate that the error "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637-38 (internal punctuation and citation omitted).  Federal courts apply AEDPA standards to the "last reasoned decision" by a state court.  Campbell, 408 F.3d at 1170); see Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding the judgment or rejecting the same claim [are presumed to] rest upon the same ground").

**B.**     **Ground One:  Evidentiary Ruling Excluding Las Vegas Photographs**

Greenspan argues he was "denied his right to confront and cross-examine his accuser, as guaranteed by the Sixth and Fourteenth Amendments . . . where the trial court prohibited him from cross-examining the complaining witness with postings on Facebook that showed her partying in Las Vegas days after she claimed the petitioner raped her." (Pet. 5, ECF No. 1, citing Davis v. Alaska, 415 U.S. 308, 317-18 (1974) and Delaware v. Van Arsdall, 475 U.S. 673, 677-78 (1986).[6]    The Van

---

[6] Although the Davis and Van Arsdall Courts articulated the objectives and scope of the Confrontation Clause and provide controlling United States Supreme Court authority on the violation standards, both cases were deciding writs of certiorari and applied the prejudice standard of Chapman v. California, 386 U.S. 18, 24 (1967), rather than the Brecht prejudice standard applicable in 28 U.S.C. § 2254 habeas proceedings.  See Van Arsdall, 475 U.S. at 680 ("an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt").  Federal habeas courts reviewing state court decisions instead must decide whether an identified constitutional error had "a substantial and injurious effect or influence in determining the jury's verdict." See Fry, 551 U.S. at 127; see also Fowler v. Sacramento County Sheriff's Dept., 421 F.3d 1027 (2005) (granting a state prisoner

<u>Arsdall</u> Court summarized the scope of the Confrontation Clause and interpretive jurisprudence.

> The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, *Pointer v. Texas*, 380 U.S. 400 (1965), "means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S., at 315. Indeed, " '[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.' " *Id.*, at 315-316 [citation omitted]. Of particular relevance here, "[w]e have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis, supra*, at 316-317 (citing *Greene v. McElroy*, 360 U.S. 474, 496 (1959)).

<u>Van Arsdall</u>, 475 U.S. at 678-79 (parallel citations omitted).

The Constitution's due process guarantees protect only a meaningful opportunity to present a defense, not an unfettered right to present all relevant evidence. *See* <u>Montana v. Egelhoff</u>, 518 U.S. 37, 42 (1996) (citing examples of proper restrictions on the introduction of relevant evidence). Nevertheless, while "state and federal lawmakers have broad latitude to establish rules excluding evidence from criminal trials," that latitude "has limits under the Constitution." <u>Holmes v. South Carolina</u>, 547 U.S. 319, 324 (2006). The Confrontation Clause provides one of those constitutional limits to ensure that criminal defendants have "a meaningful opportunity to present a complete defense." <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986).

The right to cross-examination protects the opportunity to "expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." <u>Davis</u>, 415 U.S. at 318. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." <u>Lilly v. Virginia</u>, 527 U.S. 116, 123-24 (1999), *quoting* <u>Maryland v. Craig</u>, 497 U.S. 836, 845 (1990); *see* <u>Van Arsdall</u>, 475 U.S. at 679 (finding a Confrontation Clause violation when the trial court's ruling had "prohibited *all* inquiry into the possibility that [a key prosecution witness] would be biased as a result of the State's dismissal of his pending public drunkenness charge") (emphasis in original).

---

federal habeas relief from his sex crime conviction on grounds the trial court's exclusion of certain proffered cross-examination of the victim about two prior incidents when she had alleged other men had molested her was an "objectively unreasonable" application of <u>Davis</u> and <u>Van Arsdall</u>, the exclusion denied the defendant his Sixth Amendment right to confrontation, and the error was not harmless under the <u>Brecht</u> standard).

12cv2402-AJB(BGS)

A defendant carries his burden of establishing a Confrontation Clause violation by showing that "[a] reasonable jury might have received a significantly different impression of [a witness's] credibility had . . . counsel been permitted to pursue his proposed line of cross-examination." Van Arsdall, 475 U.S. at 680; see Slovik v. Yates, 556 F.3d 747, 753 (9th Cir. 2009) (holding that the defendant was denied his confrontation rights when the trial court prevented defense counsel from cross-examining a key prosecution witness about his probation status, a provable fact that would have established he had likely lied under oath, because that impeachment could have given a reasonable jury a "significantly different impression" of the witness' credibility). Nevertheless, the Van Arsdall Court emphasized that even in circumstances where the evidence goes to the issue of a witness' possible motivation to lie, "[i]t does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness." Van Arsdall, 475 U.S. at 678.

> On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

Van Arsdall, 475 U.S. at 678-79 (parallel citations omitted); see United States v. Scheffer, 523 U.S. 303, 308, 315 (1998) (A defendant's right to present evidence in his defense is "not unlimited, but rather is subject to reasonable restrictions"; a trial court's exclusion of evidence is unconstitutional only where it "significantly undermined fundamental elements of the accused's defense"); see also Michigan v. Lucas, 500 U.S. 145, 149, 151-153 (1991) (discussing the Sixth Amendment implications of a particular rape shield statute's codified procedures and preclusion of certain evidence).

The Davis Court found a violation of the defendant's confrontation right when the trial court precluded defense counsel from developing the record on the issue of the reliability of a key prosecution witness' testimony. That Court determined that "defense counsel should have been permitted to expose to the jury the facts [of the witness' probation status] from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness," notwithstanding a state policy protecting the anonymity of juvenile offenders upon which the trial court had relied for its exclusionary ruling. Davis, 415 U.S. at 317-19 ("The claim of bias

12

which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of [the witness'] vulnerable status as a probationer . . . as well as of [the witness'] possible concern that he might be a suspect in the investigation," because "[t]he accuracy and truthfulness of [the witness'] testimony were key elements in the State's case against petitioner"). Nevertheless, " 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " Van Arsdall, 475 U.S. at 679, 684, *quoting* Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original). "As we have stressed on more than one occasion, the Constitution entitles a criminal defendant to a fair trial, not a perfect one." Id. at 681*, citing* United States v. Hasting, 461 U.S. 499, 508-509 (1983), Bruton v. United States, 391 U.S. 123, 135 (1968).

The issue of the Las Vegas photographic evidence in Greenspan's case first arose in pretrial discussions among counsel and the trial court on July 21, 2008. (Lodg. No. 2, RT vol. 1 at 2-24.) The photos at issue are described as depicting R.A. participating in suggestive partying behavior within a few days of the rape, apparently not unlike other photos R.A. and her friends previously posted on social media sites. Defense counsel argued that the Las Vegas photos were relevant to impeach statements R.A. made to Greenspan during the pretext telephone call staged by police a week after the charged rape, where R.A. represented that "she has been worrying and in solitude for a week" and could not call before because she was "just so disturbed by all of this." (Id. at 8.) Defense counsel argued in support of admitting the photos:

> She is in Las Vegas with her girlfriends and she is kind of doing the same type of stuff. It puts into context ultimately what we are dealing with in the pretext call and shows that the statements that are being made here simply aren't true. So those [photos] are in there to impeach based upon the fact that this information is coming in by way of the prosecution.

(Lodg. No. 2, RT vol. 1 at 8.)

The trial court distinguished the relevance of photographs posted on social media sites before the incident from the photographs taken in Las Vegas a few days thereafter. The court found that the former related to a period of time when R.A. and Greenspan were reconnecting and admitted them as relevant to reveal their relationship and their perspectives about their relationship, including inferences going to Greenspan's consent theory of defense. The court also observed that "the prejudicial value

13

is not enormous" and "frankly, the probative value is not enormous," ranking the photos "relatively low" on both those scales. (Lodg. No. 2, RT vol. 1 at 13-14.) "But it is of some significance when you are talking about this was my relationship with her." (Id. at 14.) In contrast, the court explained:

\\

> On the trip to Las Vegas [photographs] I feel differently. I just don't see what the relevance is unless she takes the stand and says I was devastated and I couldn't go out for several weeks, well, then, as far as attacking credibility. [Sic.] I think the pretext call is a pretext call and people say all sorts of things in a pretext call to try to get a defendant to say something. I am not sure he can attack her credibility in the pretext call. And I think people react all different ways to traumatic events in their lives and the fact that someone went out and partied afterwards doesn't necessarily have any relevance one way or the other what happened to them. I just don't see the relevance and I think that the prejudicial value is strong. And so I do really think the probative value being nonexistent is outweighed by the prejudice of putting it in as to what she is doing and I think people react differently. I don't see what the relevance is of putting those photos in or anything she did afterwards as I see it.

(Lodg. No. 2, RT vol. 1 at 14-15, 16: "So I think the photographs that she posted are relevant and I will allow them in" but the "communications unless they are between the two of them, I don't think are admissible.") After additional discussion about how social media postings occur, the court added:

> If you are saying here are photographs of what her friends say she is doing and how she is partying, now we are getting to not communication between her and Mr. Greenspan but this is her character evidence, this is what she is like and I don't think that's admissible. The reason I think it is admissible is if she is posting something on the website and then communicating with someone on that website then that is a form of communication between her and Mr. Greenspan. That's why anything she posted on her website I would allow and anything that others have posted I don't think is relevant.

(Lodg. No. 2, RT vol. 1 at 19, 21: "So I will not allow the photographs from Las Vegas or anything that happened afterwards at this point in unless something happens during the trial that convinces me otherwise.") The pretrial discussion of this issue concluded with the clarification:

> [THE PROSECUTOR]: . . . Just a quick question, Your Honor. You excluded the photographs of Las Vegas. I just wanted to make sure it was also excluding any mention of –
>
> THE COURT: Partying in Las Vegas.
>
> [THE PROSECUTOR]: Thank you.
>
> [DEFENSE COUNSEL]: Depending upon direct.
>
> THE COURT: Depending upon direct. Before you ask her about it, however, I would request that you bring it up outside the jury's presence to me and I can see if it looks like things have changed.

14

(Lodg. No. 2, RT vol. 1 at 24.)

This issue resurfaced during the trial, at the conclusion of the prosecution's direct examination of the victim and before her cross-examination. Defense counsel asked the court to reconsider its prior ruling on the Las Vegas photographs, "based upon the prosecution's case" which had included several exhibits authenticated by R.A. from her social media sites. (Lodg. No. 2, RT vol. 2 at 267.) Defense counsel stated, "I have only three of them," and argued:

> MR. PATTON: The issue as I see it is several fold. Number one, the prosecution has now presented this person and two witnesses to suggest that she is traumatized, deeply traumatized, right after this event occurs. We are over a year or year later now. She is crying on the stand. Although, quite frankly at the preliminary hearing she didn't cry at all and she just testified about the pictures that she is posting through July relative to what she is presenting. . . . And I don't know this for sure because I have never asked Ms. Aguilera the question, but Detective Burger first interviews Ms. Aguilera on the 10th in the afternoon. These are posted within the week. So friends have posted them.
>
> It is my belief . . . that she goes to Las Vegas between the 7th and the 10th. . . . But I think that those show an important part to this jury in deciding how much trauma this girl really was involved in based upon what she said here as opposed to what she is doing a day or two later in Las Vegas with her girlfriends apparently with a guy dancing and having a good time. Obviously she can offer an explanation if she wishes, but it seems to me it is now relevant because the prosecution has basically put that issue of her emotional status at or about the time of the offense now into issue.

(Lodg. No. 2, RT vol. 2 at 267-268.)

In response, the prosecutor argued:

> MS. CANO: I think trauma is not relevant in this case. Having dealt with victims of rape for 15 years I know that all victims react in different ways. Going to Las Vegas for a weekend several days after an assault has absolutely nothing to do with whether or not there is consent which is the issue in this case. The issue is not whether or not she is traumatized, how she was traumatized and how she compares to others being traumatized.
>
> What I had presented is the facts immediately surrounding the time period where she still would have been intoxicated, where it was a time period where the witnesses saw her traumatized when she would have been half an hour within the time period of having been a[ssaulted?]. The defense is going to talk about where she appeared sober but traumatized and it seems for that purpose that is all coming in because it is relevant for that purpose. What she did the day after, two days later, two weeks later is not relevant.

(Lodg. No. 2, RT vol. 2 at 268-269.)

The court reaffirmed its decision to exclude the Las Vegas photos.

> THE COURT: Okay. I will go ahead and lodge these pictures. I am not going to allow them to be put into evidence. It appears to me that the probative value is very

slight. The prejudice of Las Vegas and everything that is implied by Las Vegas is very great. So I do find that the prejudicial value outweighs the probative value at this point but we can lodge them so they are part of the record so it is clear what I looked at.

(Lodg. No. 2, RT vol. 2 at 269; *see also* <u>id.</u> at 270-271, where defense counsel's proffer of additional, apparently more explicitly suggestive photographs of R.A. and her friends posted on her social media sites about a month after the incident met a similar fate ("THE COURT: We'll keep those with the Las Vegas photos" because the court found they were similarly not relevant, the prejudicial value exceeded the probative value, and they depict conduct "after the fact" which "is not relevant on the issue of whether it was [*sic*] consent at the time.").)

This issue resurfaced a third time, also on the second day of trial. The prosecutor had nearly completed her cross-examination of Greenspan. She had thoroughly examined him about his failure at any point during the pretext call conversation to express his belief that the sexual encounter was consensual or to remind R.A. of her purportedly initiating contact that he testified led to that event. (Lodg. No. 2, RT vol. 2 at 471-472.) After the court excused the jury, defense counsel renewed his effort to have the Las Vegas photos admitted into evidence, objecting that the prosecutor had not used the pretext call in her case in chief but used it as a focal point of her cross-examination of Greenspan.

> THE COURT: The second side bar we just had and the reason I excused the jury had to do with the fact that Mr. Patton now having heard the testimony and the fact that Ms. Cano has gone in great detail into the pretext call which he did not believe she was going to be putting in and she did not put in in her case in chief and is now questioning Mr. Greenspan, Mr. Patton had indicted that he may want to recall Rainah on the issue of her reaction after the event in question and he wanted to have a chance to explain why the Las Vegas photos are now relevant and that is sort of your segue putting whatever you want to put on the record, Mr. Patton.
>
> MR. PATTON: Yes, Your Honor. Here's my concern, I mean, it bothers me that we had the transcripts [of the pretext call]. We went through the transcripts. I mean, I spent a long time trying to get these worked out back and forth to counsel. We get to opening statement. She makes her opening statement. I get up, I am in the – that portion of my opening statement where I am about to address the pretext calls [*sic*] and as I am doing that Ms. Cano objects and then I kind of approached her and I asked are you not going to put the stuff in and she said no. And so then I took a step back and kind of had to reorganize and then move on.
>
> I did not ask my client questions about that during the direct examination based upon her representations as well. So all of a sudden we are now in her cross-examination. I did not have the opportunity to lay this out for the jury in my opening. I did not have the opportunity to address it with my client because I was led to believe that she was not going to bring the stuff in and now all of a sudden it is like being blind sided. . . .

16

And then secondarily I indicated to the court my continuing belief and concern that this [pretext call] tape and the arguments that she is going to make in closing argument is how what [*sic*] a traumatic impact this event has had on Rainah Aguilera and we have photographs of her partying in Las Vegas within days of this occurring. And it seems to me that those are relevant to the degree that she is going to put in this tape because they at least give perspective to whether this woman is a drama queen or not and the arguments that are going to be made I would assume are going to be, you know, all of this trauma, Katy came and Chris came, she was crying hysterically and all this, she is crying on the stand and this is why would a person do this if she wasn't raped.

It seems to me that I should have that opportunity to confront her while she is sitting here, of course, in court which I was hoping she wouldn't be. In any event, confront her with, hey, I went to Vegas and these are pictures and I am with a guy and I am dancing with my girlfriends and apparently having a great old time a couple days after this occurred . . .

(Lodg. No. 2, RT vol. 2 at 474-476.)

The prosecutor responded that she had not planned to use the tape and transcript of the pretext call in her case and chief because "there are many self-serving statements on the pretext call". (Lodg. No. 2, RT vol. 2 at 476.) Only after Greenspan testified did she "believe some of the statements that he made on the tape become much more relevant for cross-examination of him" for impeachment purposes. (Id. at 476-477.) Regarding defense counsel's renewed argument about the Las Vegas photo evidence, the prosecutor stated: "I think that the court has heard this twice and so I am just going to submit." (Id. at 477.) After reviewing the pretext call transcript, the court ruled it was appropriate for the prosecutor to use it for impeachment purposes, then revisited the Las Vegas photos ruling in light of that transcript, concluding: "I don't see, Mr. Patton, there is anything in here that would open the door on [R.A.'s] state of mind after the fact and so I still feel under 352 that the probative value is little, if any, and the prejudicial value is great" so "I am not going to allow any questions about the Las Vegas trip." (Id.) The jury deliberated about two hours before convicting Greenspan on both charged counts. (Lodg. No. 1, CT vol. 2 at 285-294.)

Greenspan does not challenge the sufficiency of the evidence to support the verdict. Rather, he argues exclusion of the Las Vegas photographs posted on R.A.'s Facebook page foreclosed defense counsel's opportunity to impeach her testimony that she was traumatized by the July 7, 2007 incident. The only state court to have reached the merits of this claim in a reasoned decision is the California Court of Appeal affirming the judgment on direct review in its March 9, 2011 unpublished decision.

17

(Lodg. No. 7.)  The appellate court summarized this claim:

> Greenspan contends that under Evidence Code section 352, the trial court abused its discretion in excluding from evidence three photos on R.A.'s Facebook page showing her with her roommates in Las Vegas posted approximately 11 days after the incident.  Comments on the page, attributed to R.A.'s girlfriends, include statements like, "If [R.A.] and I only knew that this picture embodied the rest of our night . . .;" "Damn, hike your skirt up a little more, slut" and "This is a thank you to [R.A.] for making me wear underwear!!!!!"  Specifically, Greenspan contends that the photos "directly undercut [R.A.'s] testimony and demeanor at trial that the incident with [him] was traumatic, by showing that she was partying and placing herself in potentially the same situation as she had when she invited him to her residence on July 7, 2007."  He also contends the trial court's ruling denied him the right to confront and cross-examine R.A. regarding the Las Vegas photos, in violation of the federal Constitution.

(Lodg. No. 7, slip op. at 4-5)

The court rejected Greenspan's argument that the trial court abused its discretion in that regard.

> The pictures were taken and posted after the rape incident, and therefore were not relevant on the issue of whether R.A. consented to sexual intercourse with Greenspan. Whatever claimed probative value the photos had – specifically regarding Greenspan's claim that they undermined R.A.'s credibility because they contradicted her demeanor at trial – was minimal, and outweighed by the prejudice they would have caused in terms of confusing the issues for the jurors, and misleading them into focusing on R.A.'s conduct after the incident in Las Vegas.

(Lodg. No. 7, slip op. at 9-10.)

The court also analyzed the application of California Evidence Code §§ 1103 and 782 (addressing the exclusion of evidence of sexual conduct of a complaining witness in prosecutions for sexual offenses under California's rape shield statute).  (Lodg. No. 7, slip op. at 6-9.)  Greenspan does not challenge those rules as themselves infringing any federal constitutional right.  Rather, he argues they are not applicable because the Las Vegas photos did not involve R.A.'s sexual activity with others.  Therefore, he contends, the court of appeal erred in finding "that R.A.'s activities in Las Vegas, which involved 'suggestive poses,' was evidence of sexual conduct that was covered by the Rape Shield Law" because "there was no claim that the sexual nature of R.A.'s actions in Las Vegas indicated that R.A. consented to have sex with him."  (Traverse 21, ECF No. 14-2.)  "Instead, the conduct was offered to attack her credibility by showing that she was willing to 'party hard' and possibly expose herself to more sexual activity days after she claimed she had been raped and traumatized by Mr. Greenspan."  (Id.)  The appellate court rejected his argument.

> We disagree.  "[S]exual conduct, as that term is used in [Evidence Code] sections 782 and 1103, encompasses any behavior that reflects the actor's or speaker's willingness

to engage in sexual activity. The term should not be narrowly construed." (*People v. Franklin* (1994) 25 Cal.App.4th 328, 334, footnote omitted.) Therefore, we conclude that the Las Vegas photos, which showed R.A. and her friends in suggestive poses, was evidence of sexual conduct with the broad definition of Evidence Code sections 1103 and 782.

(Lodg. No. 7, slip op at 9.)

A federal habeas court may not revisit state court rulings on state law issues, as they are not cognizable grounds for federal habeas relief. <u>Estelle</u>, 502 U.S. at 68; <u>Bradshaw</u>, 546 U.S. at 76. In both his Petition and his Traverse, Greenspan revisits at length the details of the trial testimony in an attempt to undercut the state court findings on this issue, but relies on no controlling United States Supreme Court authority directly or by extension on point in these circumstances. Rather, he implicitly urges this Court to adopt and substitute his interpretation of the evidence for that of the trial court issuing the evidentiary rulings as well as for the analysis and rationale of the court of appeal affirming his conviction under that state law authority. This Court's jurisdiction under 28 U.S.C. § 2254 does not extend so far. <u>Bradshaw</u>, 546 U.S. at 76.

The court of appeal disposed of the federal Confrontation Clause component of this claim by finding that even if the trial court ruled in error, the error did not rise to the level of a constitutional violation. " '[T]he application of ordinary rules of evidence . . . does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of *Watson* [<u>People v. Watson</u>, 46 Cal.2d 818, 836 (1956)].' (*People v. Marks* (2003) 31 Cal.4th 197, 227.)."[7] (Lodg. No. 7, slip op. at 10.) After a thorough analysis of the record applying that legal authority, the court denied Greenspan relief, concluding: "It is not reasonably probable that Greenspan would have obtained a more favorable verdict if the Las Vegas photos had been admitted into evidence." (Lodg. No. 7 at 11.)

In the 21 pages of argument Greenspan devotes to this claim in his Traverse, the only federal

---

[7] "Even assuming error, we reject the claim. Greenspan argues we should apply the prejudice standard under *Chapman v. California* (1967) to his claim he was denied his confrontation rights. We disagree. The applicable standard is that of *People v. Watson* (1956) 46 Cal.2d 818, 836. In general, if a trial court erroneously excludes evidence, the defendant must show on appeal that it is reasonably probable he or she would have received a more favorable result had that evidence been admitted. (*Ibid.*; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1125.) . . . . Therefore, the erroneous exclusion of evidence having only slight probative value on a minor or subsidiary issue does not violate a defendant's federal constitutional rights. (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.)" (Lodg. No. 7, slip op. at 10.)

12cv2402-AJB(BGS)

authority he cites in support of this claim, besides the <u>Davis</u> and <u>Van Arsdall</u> cases, is the United

States Supreme Court authority of <u>Olden v. Kentucky</u>, 488 U.S. 227 (1988) (per curiam), reviewing

a kidnapping, rape, and sodomy prosecution.  (Traverse 3-24, ECF No. 14-2.)  He relies on <u>Olden</u> for

the proposition:  "Under clearly established federal law as interpreted by the United States Supreme

Court, Rape Shield laws *per se* may not violate the right to confrontation, but they cannot [be] applied

to exclude relevant evidence that impeaches the testimony of the complainant."  (Traverse 22-23, ECF

No. 14-2.)  However, the <u>Olden</u> case is distinguishable.

Deciding a petition for writ of certiorari, the <u>Olden</u> Court reversed a judgment on grounds the

trial court's refusal to permit a black defendant to cross-examine the white complainant regarding her

cohabitation with her black boyfriend was based on mere speculation as to the potential effect of such

evidence on jurors' racial biases.  "While a trial court may, of course, impose reasonable limits on

defense counsel's inquiry into the potential bias of a prosecution witness, to take account of such

factors as 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that

[would be] repetitive or only marginally relevant,' . . . the limitation here was beyond reason."  <u>Olden</u>,

488 U.S. at 232, *quoting* <u>Van Arsdall</u>, 475 U.S. at 679.  The <u>Olden</u> Court found a violation of the

defendant's Sixth Amendment confrontation right because the excluded evidence had impeachment

value to support the witness' motive to lie about the forcible nature of defendant's conduct, and the trial

court had excluded that evidence "without acknowledging the significance of, or even adverting to,

petitioner's constitutional right to confrontation" on the unreasonable ground that "petitioner's right

to effective cross-examination was outweighed by the danger that revealing [the complainant's]

interracial relationship would prejudice the jury against her."  <u>Id.</u> (holding "[s]peculation as to the

effect of jurors' racial biases cannot justify exclusion of cross-examination with such strong potential

to demonstrate the falsity of [the complainant's] testimony").  The <u>Olden</u> Court identified the

complainant's motive to lie about the consensual nature of the charged sex crimes as fear of

jeopardizing her relationship with the boyfriend she was living with at the time.

" '[A] criminal defendant states a violation of the Confrontation Clause by showing that he was

prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical

form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors

. . . could appropriately draw inferences relating to the reliability of the witness.' " Olden, 488 U.S. at 231, *quoting* Van Arsdall, 475 U.S. at 680 (*quoting* Davis, 415 U.S. at 318).

> In the instant case, petitioner has consistently asserted that he and [the woman] engaged in consensual sexual acts and that [she] -- out of fear of jeopardizing her relationship with [her live-in boyfriend] -- lied when she told [the boyfriend] she had been raped and has continued to lie since. It is plain to us that "[a] reasonable jury might have received a significantly different impression of [the witness'] credibility had [defense counsel] been permitted to pursue his proposed line of cross examination."

Olden, 488 U.S. at 232, *quoting* Van Arsdall, 475 U.S. at 679.

Defense counsel in Greenspan's case suggested a potential boyfriend angle as a motive for R.A. to lie about the nature of the incident, but that inference and its probative value are vastly more tenuous and attenuated than in Olden.[8]  Counsel suggested that R.A. might have lied about the consensual nature of her sexual encounter with Greenspan to avoid jeopardizing her potential future reconciliation with a prior boyfriend.  However, unlike in Olden, and contrary to the "significantly different impression" of R.A.'s credibility on the issue of consent required under Davis and Van Arsdall to establish a Confrontation Clause violation, a review of the trial record reveals that the primary purpose Greenspan's attorney argued for seeking admission of the Las Vegas photos was not to establish a motive for R.A. to lie about the forcible nature of the encounter.  Rather, counsel wanted to use that evidence to undermine her testimony on the tangential issue of the purported severity of her post-incident trauma.  As set forth above, the trial court reasonably feared the Facebook photos of her partying in Las Vegas could be interpreted as depicting her character and based their exclusion on grounds they had no probative value on the issue of consent and only speculative value to show R.A. was not traumatized by her sexual encounter with Greenspan and therefore it must have been consensual rather than forcible.  The court of appeal reasonably concurred with the trial court's ruling.

The question on federal habeas review is limited to whether the challenged state court result

---

[8]  Greenspan argues in his Traverse: "It was Mr. Greenspan's defense . . . that R.A. was lying when she testified that the sex with Mr. Greenspan was without her consent.  It was Mr. Greenspan's defense that she realized her actions with Mr. Greenspan would have gotten back to her on again/off again boyfriend Gabe, with whom she had broken up but was getting back together in Spring and Summer of 2007 [Lodgment 2, 2RT 257-258, 303]."  (Traverse 23-24, ECF No. 14-2.)  He speculates expansively: "In which case, she would have felt it was necessary to convince all her friends and roommates she had been raped as soon as possible, and the Facebook posting would have been critical in showing from her actions and demeanor a few days later that she cried rape as an act meant to convince those around her that she had been forced to have the sex even though it looked like, and R.A. knew it had been, consensual."  (Id. at 24.)

12cv2402-AJB(BGS)

conforms to United States Supreme Court authority and is based on an objectively reasonable determination of the facts from the record presented. 28 U.S.C. § 2254(d). Defense counsel was denied the opportunity to use the proffered Las Vegas photos to suggest R.A.'s testimony exaggerated or belied the severity of her claimed consequent trauma. Greenspan does not identify any controlling federal authority directly on point which the state court unreasonably applied or to which the state court result is contrary. Absent controlling authority, he cannot satisfy 28 U.S.C. § 2254(d)(1). Carey, 549 U.S. at 77; Moses, 555 F.3d at 754. In addition, whether as an evidentiary ruling proposition or as a Confrontation Clause violation, that court reached an objectively reasonable conclusion based on the trial record: "It is not reasonably probable that Greenspan would have obtained a more favorable verdict if the Las Vegas photos had been admitted into evidence," foreclosing relief under 28 U.S.C. § 2254(d)(2). (Lodg. No. 7, slip op. at 11.)

> Contrary to Greenspan's assertion that this case was merely a credibility contest between R.A.'s and his testimonies, there was strong evidence other than their conflicting testimonies to support the jury's verdict. R.A.'s roommate testified that R.A. was curled up on the laundry room floor crying because of what had happened to her. The jury could reasonably infer it was unlikely she would have been so emotionally distraught had she engaged in consensual sex with Greenspan. The friends she spoke to by phone after the incident reported she was shaken up, and when they picked her up to take her to the hospital she was crying. R.A. also was crying while she talked to police immediately following the incident. She reported to the SART nurse regarding the nature and extend of her injuries, and the nurse concluded the redness was consistent with R.A.'s account, although the nurse did not rule out nonconsensual [sic] sex. Finally, the jury could easily have viewed both Greenspan's question to the roommate regarding whether R.A. thought he had raped her and his comments in the pretext call as implied admissions of his guilt. Based on this accumulated evidence, and taking into account Greenspan's contrary claim that they had consensual sex, the jury had abundant basis for the convictions.

(Lodg. No. 7, slip op. at 10-11.)

Defense counsel vigorously cross-examined R.A., suggesting potentially impeaching interpretations of her conduct based on her prior relationship with Greenspan, their interactions in the days leading up to the July 7, 2007 incident, and her prior statements. As recently observed by the United States Supreme Court, evaluating the effect on the defendant's right to present a complete defense of a trial court's exclusion of impeachment evidence in a rape prosecution:

> The admission of extrinsic evidence of specific instances of a witness' conduct to impeach the witness' credibility may confuse the jury, unfairly embarrass the victim, surprise the prosecution, and unduly prolong the trial. No decision of this Court clearly establishes that the exclusion of such evidence for such reasons in a particular

case violates the Constitution.

Nevada v. Jackson, __ U.S. __, 133 S.Ct. 1990, 1993-94 (2013) (reversing a Ninth Circuit grant of habeas relief on grounds the manner of its application of AEDPA review standards "defeated the substantial deference that AEDPA requires").

On this record, it is recommended that the Court defer to the state court's determination that exclusion of the three Las Vegas photos did not deny Greenspan any right arising under the Confrontation Clause. Even if the exclusion of the photographs rose to the level of a constitutional violation, Greenspan has not demonstrated that the evidentiary ruling had a substantial and injurious effect upon the jury's verdict. Hernandez v. Small, 282 F.3d 1132, 1144 (9th Cir. 2002), citing Brecht, 507 U.S. at 637, 113 S.Ct. 1710). For all the foregoing reasons, it is recommended relief on Ground One be **DENIED** because the state court's resolution of this claim was not contrary to or an unreasonable application of clearly established federal law nor an unreasonable determination of the facts from the record presented. 28 U.S.C. § 2254(d).

## C.    Ground Two:   Ineffective Assistance Of Counsel (IAC)

Greenspan argues his Sixth and Fourteenth Amendment right to the effective assistance of trial counsel was denied in three ways. First, he contends his attorney failed to convey a plea offer that would have allowed him to avoid the sex offender registration consequence of his conviction. Second, he argues counsel failed to investigate and present a particular videotape to impeach the victim's trial testimony. Third, he argues counsel failed to interview and call character witnesses to testify that he is not a combative or assertive person. The San Diego County Superior Court is the only state court to have addressed Greenspan's IAC claims on the merits in a reasoned decision. (Lodg. No. 16.) In its October 18, 2010 order denying his petition for writ of habeas corpus, that court summarized:

> The instant Petition is based upon the ground that Petitioner's trial counsel provided ineffective assistance by:  (1) failing to accurately convey to Petitioner the People's pre-trial plea offer; (2) failing to present evidence of the victim's conduct after the subject incident; and (3) failing to interview and present character witnesses.
>
> The short resolutions regarding each of these grounds are (1) that there has been strong evidence presented that the People never made the offer that Petitioner alleges was never conveyed to him; (2) there is evidence that counsel made the reasoned tactical decision that a video did not discredit  the victim as Petitioner contends; and (3) there is also further evidence that proposed character evidence would have only been marginally effective and would not have overcome the strength of the

prosecution's case.

(Lodg. No. 16 at 1-2.)

\\

\\

### 1. Legal Standards Controlling Ineffective Assistance Of Counsel Claims

A defendant claiming IAC must show both (1) deficient performance under an objective standard of reasonableness and (2) prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). To demonstrate deficient performance, "[t]he challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " Richter, 131 S.Ct. at 787, *quoting* Strickland, 466 U.S. at 687. To demonstrate prejudice, the petitioner must show that "but for counsel's unprofessional errors," there is a reasonable probability "the result of the proceeding would have been different." Strickland, 466 U.S. at 690, 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome"); *see* Richter, 131 S.Ct. at 792 ("The likelihood of a different result must be substantial, not just conceivable"). "Because failure to meet either [Strickland] prong is fatal to [an IAC] claim, there is no requirement that we 'address both components of the inquiry if the defendant makes an insufficient showing on one.' " Gonzalez v. Wong, 667 F.3d 965, 987 (9th Cir. 2011), *quoting* Strickland, 466 U.S. at 697; *see* Bell v. Cone, 535 U.S. 685, 695 (2002) ("Without proof of both deficient performance and prejudice to the defense . . . the sentence or conviction should stand") (citation omitted).

Reviewing courts must apply a "strong presumption" that "counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689; Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (same). "[H]indsight cannot suffice for relief when counsel's choices were reasonable and legitimate based on predictions of how the trial would proceed." Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 745 (2011), *citing* Richter, 131 S.Ct. at 770. Federal habeas courts must ask "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard," not "whether counsel's actions were unreasonable." Richter, 131 S.Ct. at 785, 788. "[I]t is not enough to convince a federal habeas court that, in its independent judgment, the state court decision applied *Strickland* incorrectly." Ortiz-Sandoval v. Clarke, 323 F.3d 1165, 1172 (9th

Cir. 2003), *quoting* <u>Bell</u>, 535 U.S. at 699. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Richter</u>, 131 S.Ct. at 786.

\\

\\

## 2. <u>Failure To Convey Plea Offer</u>

Greenspan alleges his trial attorney "failed to convey to [him] the prosecution's pre-trial offer to allow him to plead guilty to a reducible felony that did not require sex offender registration pursuant to California Penal Code § 290" in violation of his federal constitutional right to effective assistance of counsel. (Pet. 7, ECF No. 1.) Remarks by the prosecutor at the sentencing hearing, where Greenspan was represented by new counsel he retained after his conviction, created the ambiguity underpinning this claim. She stated:

> MS. CANO: Your Honor, I think that that this was a sad case for all parties and I think that is why Mr. Patton who is an excellent attorney tried to persuade me to accept an offer 236, 237 which would have been a felony. Could have been reduced to a misdemeanor and would have had no 290 or sex offender registration for the rest of his life. Reluctantly I agreed to that. Within five minutes Mr. Patton called me back after speaking to the family and it was the arrogance of the family that now ties the court's hands. It is the family that decided, no, we are going to go forward. And I think . . . the only option for this court is to give him the three years that is mandated by law.

(Lodg. No. 2, RT vol. 5 at 683.) New defense counsel stated in response to those remarks: "I think there might have been a little confusion about what offer Ms. Cano alluded to earlier. . . ." (<u>Id.</u> at 684.)

The superior court framed this claim as an allegation that counsel "fail[ed] to accurately convey to Petitioner the People's pre-trial plea offer. . . ." (Lodg. No. 16 at 2.) According to Greenspan, that offer was for "a lesser offense coupled with the stipulation that a lifetime requirement to register as a sex offender would not be included." (<u>Id.</u> at 3.) The court concluded that contrary to Greenspan's claim, "This did not occur." In making that determination, the court considered evidence submitted by the parties in connection with the habeas proceeding, including the People's "detailed declaration from Petitioner's original trial counsel, Bradley Patton" and a declaration from the prosecutor, Deputy District Attorney Cano, that "verifies" defense counsel's claim in his declaration "that the People never presented the offer" Greenspan argues counsel failed to convey to him. (<u>Id.</u> at 2-3.)

25

Mr. Patton included the following paragraph in his declaration, which was signed under penalty of perjury, and that must be taken at face value. It leaves little doubt as to what occurred. . . . [¶] Said Mr. Patton: "My suggested resolution was for Kyle to plead guilty to a reducible felony (PC 237) with no PC 290 registration. At no time did the District Attorney's Office extend an offer of settlement of PC2[3]6/237 with no PC 290 registration. Ms. Cano . . . never indicated to me that her office would agree to this resolution. Nor did Kyle or his family give me the authority to make that specific offer of settlement in this case." (Patton Declaration, page 4:9-13.)

(Lodg. No. 16 at 3.)

Ms. Cano's Declaration, also signed under penalty of perjury, "indicates that Patton asked if she would consider a reduction to a misdemeanor after 18 months." (Lodg. No. 16 at 3.)

She told him she would not consider that, but did state she would consult her supervisor about an offer of a plea to a PC 236/237 charge, although she did not recall any mention of the registration requirement. [¶] Deputy Cano then states in her declaration: "I went back to my office with the intention of discussing the counter offer with [her supervisor] but[] stopped in my office before going to her office. Within minutes of reaching my office, Mr. Patton called me and told me not to bother running the offer by my supervisor because Mr. Greenspan was not interested in pleading guilty to any charge. I never discussed Mr. Patton's counter offer with my supervisor because I considered it withdrawn." (Cano Declaration, page 3:20-24.)

(Lodg. No. 16 at 3.)

The court observed that "[t]he problem in this case is not with the above quotations that clearly indicate no offer was made and thus, there can be no claim of failure to convey an offer that did not exist," but rather arises from the prosecutor's statement at the sentencing hearing, reproduced above. (Lodg. No. 16, p. 3.) The court accepted the prosecutor's clarifying explanation in her declaration addressing the ambiguity created by her remark at sentencing.

. . . Deputy Cano readily admits that she made an "off the cuff" reference during the sentencing hearing "to the readiness conference in which Mr. Patton suggested that I accept a plea to Penal Code sections 236 and 237. I quickly stated, 'reluctantly I agreed to that.' I failed to be more precise about the fact that I *agreed to discuss it with my supervisor*. But, I was intercepted by Mr. Patton before I had a chance to do so. I never *agreed to any offer* made by Mr. Patton." (Cano Declaration, page 4:26-5:1. Emphasis in original.)

Petitioner continues to focus on the one phrase – "reluctantly I agreed to that" -- to incorrectly verify that the People made the offer but then Petitioner's trial counsel failed to convey it to him. [¶] However, the evidence presented by the People simply does not justify that conclusion and this Court declines to accept the contention that a favorable offer was made by the prosecution but trial counsel was ineffective for failing to convey it to Petitioner to give him the opportunity to accept it.

(Lodg. No. 16 at 4.)

In addition to the declarations from the prosecutor and defense counsel, the superior court

26

12cv2402-AJB(BGS)

considered in support of this claim the evidence Greenspan provided in the form of his own declaration and declarations from family members, post-trial defense counsel Denevi, and Denevi's assistant. None substantiates that a specific offer containing terms that included avoidance of sex offender registration was ever formalized or extended by the prosecutor in a manner that Greenspan could have

\\

accepted to resolve the criminal charges. The state court, relying on competent evidence in the record, thus resolved this claim in an objectively reasonable manner.

In his federal Petition, Greenspan relies on <u>Missouri v. Frye</u>, __ U.S. __, 132 S.Ct. 1399 (2012) to support this IAC claim. The <u>Frye</u> Court addressed the question "whether defense counsel has the duty to communicate the terms of a formal offer to accept a plea on terms and conditions that may result in a lesser sentence, a conviction on lesser charges, or both." <u>Frye</u>, 132 S.Ct. at 1408. That Court held: "as a general rule, defense counsel has the duty to communicate *formal offers* from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." <u>Frye</u>, 132 S.Ct. at 1408-09 (emphasis added) (finding IAC for allowing a prosecutor's written plea bargain offer containing a fixed expiration date to expire without advising the defendant or allowing him to consider it, and prejudice to the defendant as a result of that deficient performance).

Greenspan characterizes trial counsel's allegedly deficient performance on this issue as a "mistake" of constitutional magnitude for purported "failure to accurately convey a *possible* offer" or "a *potential* pre-trial offer" he would have accepted. (Traverse 24, ECF No. 14-2 (emphasis added).) In contrast to <u>Frye</u>, the record reflects that Greenspan's prosecutor extended no formal plea offer, written or even verbal, containing the no sex offender registration term. Although Greenspan may well have accepted a plea offer that provided for avoidance of the sex offender registration consequence, as he now represents, the record reflects his attorney's attempt to secure such an offer never came to fruition. Unless the prosecutor formally extended that offer, <u>Frye</u> is distinguishable on material facts, and its holding does not control the resolution of this claim. Greenspan identifies no controlling United States Supreme Court authority for the proposition that an inchoate bargain proposed by defense counsel during plea negotiations, even one a prosecutor may have agreed to

propose to his or her supervisor, can support an IAC claim on this theory when there was no resulting offer that defense counsel could have communicated to the defendant. He accordingly has not shown that the state court reached an unreasonable result under the deference exceptions of 28 U.S.C. § 2254(d)(1) or (d)(2), and he identifies no clear and convincing evidence on which this Court could rely to disturb the state courts' rejection of this IAC claim. For the foregoing reasons, it is recommended relief on

\\

this theory be **<u>DENIED</u>**, as the state court result is not contrary to or an unreasonable application of Strickland, nor an unreasonable determination of the facts from the record. 28 U.S.C. § 2254(d).

### 3. <u>Failure To Present Videotape Evidence Of Victim's Conduct</u>

Greenspan argues "trial counsel failed to investigate and present evidence of the complainant's conduct subsequent to the incident that contradicted her testimony at trial" in alleged violation of his federal constitutional right to effective assistance of counsel. (Pet. 7, ECF No. 1.) The superior court addressing this claim on habeas review summarized the evidence at issue:

> Approximately <u>one year</u> after the subject rape, the victim and some friends went to a bar where Petitioner worked. There was a surveillance tape showing the victim standing outside that bar, appearing to talk to the bouncer at the door. The tape indicates the victim never entered that bar and a friend came out, there was a hug, and the victim left.

(Lodg. No. 16 at 4 (emphasis in original).)

Greenspan describes in greater detail the images captured on the videotape and the basis for his IAC claim on this theory:

> A surveillance video taken at the Bar on June 14, 2008, while Mr. Greenspan was working there, shows Rainah A. standing outside the front door of the First Street Bar for several minutes, clearly visible to those inside the bar [Petitioner's Exhibit P, ¶ 6, p. 42]. Mr. Greenspan informed Mr. Patton of this surveillance video, which showed R.A. had gone out of her way to make her presence known to the petitioner at his place of employment, despite several no contact orders. [Petitioner's Exhibit E, ¶¶ 14-16, pp. 13-14, Petitioner's Exhibit Q, pp. 43-45.)

(Pet. 12, ECF No. 1.) Although Greenspan's references to "Petitioner's Exhibits" do not correspond to any attachments to the federal Petition where he provides none (*see* ECF No. 1), based on his Traverse references, it appears he may be referring to the exhibits to his habeas petition filed in the California Supreme Court, provided here as Lodgment No. 17.

Trial counsel are accorded broad latitude in the assessment and conduct of a case. <u>Cullen v. Pinholster</u>, __ U.S. __, 131 S.Ct 1388, 1400-01 (2011); <u>Strickland</u>, 466 U.S. at 689. For purposes of resolving IAC claims predicated on failure to investigate, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." <u>Strickland</u>, 466 U.S. at 690-91.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

<u>Strickland</u>, 466 U.S. at 690-91.

Greenspan challenges his trial attorney's tactical decision not to use the videotape to rebut R.A.'s contention in the pretext telephone call "that she was so devastated by the incident that it had taken her a week to call him." (Traverse 36, ECF No. 14-2.) He argues: "Similarly [to the rebuttal value of the Las Vegas photos], the conduct of . . . R.A., by going to Mr. Greenspan's place of employment despite a no contact order, was conduct, albeit post-offense conduct, that was showed [*sic*] directed to him that showed she was not traumatized." (<u>Id.</u>: "Evidence that R.A. attempted to contact, or at least make her presence know to Mr. Greenspan despite non-contact orders from the court, would have been relevant to undercut her version of events at trial that she had been taken advantage of by him, whom she had known since grade school, whom she invited over to her residence in the early morning hours of July 7, 2007, and invited up to her bedroom.") The superior court characterized as "pure speculation" Greenspan's "flawed" argument by noting that there was no sound on the tape to support his claim R.A. exhibited "taunting behavior" and by observing that the remote timing after the rape of her appearance at the bar undermined his arguments that the incident could support a finding that "there was no rape" and that the tape shows she "was not traumatized by the encounter." (<u>Id.</u> at 5-6.)

The even greater remoteness in time of the videotape from the rape than the Las Vegas photographs, and the fact that the videotape would have been offered solely for the same purpose as the excluded photographs, suggest virtually no likelihood that the trial court would have admitted that

evidence. Like the photographs, the videotape depicted post-event conduct having no direct bearing on a defense of consent, even though Greenspan summarily argues R.A.'s appearance outside the bar as "clearly directed to the petitioner," unlike the Facebook postings. The superior court rejected the claim, relying on the sworn declarations from trial counsel and from the victim. Counsel's explanations support his considered decision not to attempt to introduce the videotape as trial evidence after he satisfied his duty to investigate. Counsel was aware of how R.A. would likely explain the videotape. The court relied on quotations from Mr. Patton's declaration in support of its findings:

> "Based on what Kyle said about the situation [as depicted in the above-referenced video tape], I believed that it had potential negative value. If presented at trial, the alleged victim would have to be confronted with it. I believed that she would explain that when she got there, she learned Kyle was present. So, she stayed outside and soon left. In my view, the alleged victim was playing the 'poor me' card and there was nothing to impeach her with after explaining away the video. Rather than supporting any defense, I believed that the video could hurt Kyle at trial since it could be interpreted that she did not want any contact with him and went there with the hope that he was not working. Based on what Kyle told me, all of the facts of the case, and my trial experience, I decided not to investigate the video further. ¶ On August 2, 2010, I watched a copy of the video, which was provided to me by Deputy District Attorney, Bryn Kirvin. I watched the full length of the video. After having viewed it and after having tried the case, there is no change in my opinion about the evidentiary value of the video. It does not change my mind about how I would investigate this case, nor the way I would prepare and present the defense for the jury." (Patton Declaration, page 4:22-6:6.)

(Lodg. No. 16 at 5.)

    In her declaration, provided in opposition to Greenspan's habeas petition, as summarized by the superior court R.A. represented "she did not want to go to that bar at that time and only went because her friends wanted to go. Moreover, because she did not want to discuss the rape incident – of which the friends were not aware – she reluctantly went along." (Lodg. No. 16 at 6.) That explanation of her presence at the bar as well as her decision not to go in, carried greater potential for inferences harmful to Greenspan's defense than for favorable inferences. Applying <u>Strickland</u> standards, the superior court concluded not only that Greenspan failed to satisfy the deficient performance prong of an IAC analysis, but also he "presented nothing more than speculation that investigation and potential use of this tape at trial would have produced a different result than the guilty verdict," failing the prejudice prong as well. (Lodg. No. 16 at 6.)

    Greenspan's statement here of  hypothetical uses a jury might have made of the videotape

vastly overstates its evidentiary value to undermine R.A.'s credibility and totally ignores the more plausible contrary inferences discernable from the declarations reflecting how the evidence would likely have been presented, explained, and perceived to his disadvantage by the jury.[9]  Even if counsel's decision rose to the level of unprofessional error, the record substantiates "that counsel made the reasoned tactical decision that a video did not discredit the victim as Petitioner contends" and Greenspan suffered no prejudice that decision.  (Lodg. No. 16 at 2.)

According the requisite "double deference" to the reasonable decisions of trial counsel and to the state court's reasonable factual determinations from this record, it is recommended the Court **DENY** habeas relief on this theory, as the result is not contrary to or an unreasonable application of Strickland nor predicated on an unreasonable determination of the facts from the record presented. 28 U.S.C. § 2254(d).

### 4.    Failure To Present Character Witness Testimony

Greenspan argues "trial counsel failed to interview witnesses and present character witnesses on behalf of the petitioner" in purported violation of his federal constitutional right to effective assistance of counsel.  (Pet. 7, ECF No. 1.)

> Prior to trial, the petitioner gave Mr. Patton the names of several character witnesses, including two friends he had known since high school. . . . Neither of those witnesses were [sic] contacted by Mr. Patton prior to Mr. Greenspan's trial.  Both of these witnesses would also have testified Mr. Greenspan was very athletic, but that in his general dealings with people he appeared passive and would often admit to being at fault just to make other people feel better.

(Pet. 13, ECF No. 1 (exhibit citations omitted).)

Greenspan complains that the prosecutor used his own trial testimony that he was good in sports and was employed as a security guard against him in closing argument, "to show he was capable of forcing Rainah to have sex with him."  (Pet. 13, ECF No. 1, citing 3 RT 545, 548.)  He also contends the prosecutor used the evidence of his having called R.A. to apologize for his conduct to

---

[9]  Ignoring R.A.'s sworn explanation for her presence outside the bar a year after the rape, Greenspan expansively speculates: "In the context of this case, however [contrary to the last reasoned state court decision rejecting this claim], such evidence would have undermined the portrayal of R.A. as someone who had been overwhelmed and intimidated by a former trusted friend, and shown her as seeking out Mr. Greenspan even when warned not to.  This would have raised the reasonable probability that she manufactured the rape charge so as to keep open a possible rapprochement with her estranged boyfriend Gabe, despite her willingness to have had sex with Mr. Greenspan."  (Traverse 37, ECF No. 14-2.)

infer consciousness of guilt. He argues his character witnesses "would have been helpful . . . to show he was not the kind of person who would take sexual advantage of a woman and that he would often apologize to people during an argument even though he did not believe he was [at] fault [Lodgment 17, Petitioner's Exhibit N, ¶ 3, p. 37; Petitioner's Exhibit O, ¶ 4, p. 39.]" (Traverse 38, ECF No. 14-2.) The superior court summarized his argument:

> Petitioner argues that these character witnesses, had they testified, would have related to Petitioner's character and his lack of assertiveness when confronted. Petitioner maintains that these witnesses would have told the jury that despite Petitioner's size and 'athletic prowess,' he was not confrontational and assertive and would have attempted to mollify the victim by not contradicting her during a pretext call instead of confronting her directly.

(Lodg. 16 at 6.)

In denying relief on this theory, the court relied on defense counsel's sworn declaration explaining his decision not to present character evidence at trial:

> Again, under penalty of perjury, Mr. Patton explained that "Both Kyle and the alleged victim were very intoxicated [at the time of the rape]. Kyle was a young male and, for lack of a better word, he worked in a 'party' environment. I believed that a jury would not be influenced by this type of testimony under these circumstances and would only provide the prosecution with more opportunities to argue the facts in front of the jury through cross examination. Therefore, I made a calculated decision not to present character evidence in this case." (Patton Declaration, page 5:23-28.)

(Lodg. No. 16 at 6-7.)

The court found "that proposed character evidence would have only been marginally effective and would not have overcome the strength of the prosecution's case." (Lodg. No. 16 at 2.) Like his other IAC allegations, the court characterized this claim as "based upon speculation without much more." (Lodg. No. 16 at 7.)

> Petitioner has provided a declaration from one of the potential witnesses not called to testify at trial to indicate Petitioner's character, but it really does little more than explain certain pictures that Petitioner placed on the very public Facebook website. However, there is absolutely **no** evidence provided that the testimony of these witnesses would have convinced the subject jury to return with anything but the guilty verdict.

(Lodg. No. 16, at 7 (emphasis in original).)

Although Greenspan contends that testimony from his friends "would have bolstered Mr. Greenspan's credibility with relevant character evidence" (Traverse 39, ECF No. 14-2), as reasonably found by the state court, he fails to make the case that but for the absence of that evidence, the

outcome of his trial would have been more favorable to him, defeating the element of prejudice required to prevail on an IAC theory. Moreover, it is unlikely that witnesses whose only contribution to the defense would have been to vouch for Greenspan as ordinarily an unassertive person could offset the large role his significant intoxication played in the unfolding of events on July 7, 2007. The trial court suggested as much, observing at sentencing: "I think alcohol played a huge role in this case and I think that I hope that [*sic*] Mr. Greenspan can recognize that because I think it is very clear to me that he had a lot to drink that night, too much to drink. And the fact that he denies that, that's a problem. It troubles me." (Lodg. No. 2, RT vol. 5 at 685.) Greenspan cites no controlling federal authority for the proposition that defense counsel must present all witnesses identified by the defendant or pursue any particular trial strategy merely because the defendant desires it. The United States Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success," Knowles v. Mirzayance, 556 U.S. 111, 123 (2009), let alone tangential character witness testimony with no exonerating content.

The question on federal habeas review is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard," not "whether counsel's actions were unreasonable." Richter, 131 S.Ct. at 788, 785. For all the reasons discussed above, applying the "double deference" federal habeas courts owe to state court IAC determinations, the Court should find that Greenspan received effective trial representation and that there is no reasonable probability the result of his prosecution would have been more favorable if only his attorney had performed as Greenspan argues he should have. Accordingly, it is recommended the Court **DENY** relief on Ground Two.

## D.     No Evidentiary Hearing Warranted

Greenspan requests an evidentiary hearing associated with the plea bargain issue. (Traverse 35, ECF 14-2; *see also* Traverse 2, ECF 14: "The petitioner agrees that the facts in the state court proceedings as presented in case no. D054840 are sufficient to review the claim of the denial of Mr. Greenspan's Sixth Amendment right of confrontation as a result of the trial court's refusal to admit postings by the complainant on her Facebook Page; but he disputes that the state court record is sufficient to decide the claim of ineffective assistance of counsel [on the "failure to convey a potential pre-trial offer"], because Mr. Greenspan was denied an evidentiary hearing to determine the

determinative issue of credibility, in violation of Due Process of Law.")

AEDPA prescribes the manner in which federal habeas courts must approach the factual record and "substantially restricts the district court's discretion to grant an evidentiary hearing." Baja v. Ducharme, 187 F.3d 1075, 1077 (9th Cir. 1999). "[A] determination of a factual issue made by a State court shall be presumed to be correct," with the petitioner having "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Section 2254(e)(2) limits "the discretion of federal habeas courts to take new evidence in an evidentiary hearing." Cullen, 131 S.Ct at 1400-01. "If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim" unless the applicant shows that the claim relies on a new rule of constitutional law "made retroactive on collateral review by the Supreme Court, that was previously unavailable," or "a factual predicated that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A). In the latter circumstance, the petitioner must also demonstrate that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B). Greenspan attempts no such showings.

Moreover, "[b]ecause a federal court may not independently review the merits of a state court decision without first applying the AEDPA standards, "a federal court may not grant an evidentiary hearing without first determining whether the state court's decision was an unreasonable determination of the facts." Earp v. Ornoski, 431 F.3d 1158, 1166-67 (9th Cir. 2005), citing Lockyer, 538 U.S. at 71; see Schriro, 550 U.S. at 474 ("Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate"). "If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." Cullen, 131 S.Ct at 1400-01 ("[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review"). If a claim subject to 28 U.S.C. § 2254(d)(1) does not satisfy that statutory requirement, it is "unnecessary to reach the question whether § 2254(e)(2) would permit a [federal] hearing on th[at] claim." Id. at 1400 (citation omitted); see also id. at 1400 n.7 (noting that

an unreasonable determination of fact under § 2254(d)(2) must be unreasonable "in light of the evidence presented in the State court proceeding," and stating that "[t]he additional clarity of § 2254(d)(2) on this point . . . does not detract from our view that § 2254(d)(1) also is plainly limited to the state-court record") (emphasis added). "In practical effect, . . . this means that when the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.' " Cullen, 131 S.Ct. at 1401, 1399 (citation omitted).

\\

After Cullen, the Ninth Circuit has held that a federal habeas court may consider new evidence only on de novo review, subject to the limitations of § 2254(e)(2). See Stokley v. Ryan, 659 F.3d 802, 808 (9th Cir. 2011). AEDPA review when a state court decision has reached the merits of a federal claim is not de novo but rather is highly deferential. This Court is accordingly limited to consideration of only the evidence that was before the state court in determining whether § 2254(d) is satisfied in Greenspan's case. He does not satisfy any of the exacting prerequisites to an evidentiary hearing on federal habeas review. For the reasons discussed above, this Court recommends a finding that none of Greenspan's claims satisfies the statutory requirements of 28 U.S.C. § 2254(d)(1), and by its express terms, 28 U.S.C. § 2254(d)(2) restricts federal habeas review to the record that was before the state court. Accordingly, the Court should find that an evidentiary hearing is neither warranted nor permissible under the AEDPA restrictions and should **DENY** his request.

For all the foregoing reasons, the undersigned recommends that the Court find that the state court decision on none of Greenspan's federal claims is contrary to or an unreasonable application of controlling federal authority and that the state courts made objectively reasonable factual determinations from the record in reaching their results. See 28 U.S.C. § 2254(d). Thus, neither AEDPA exception to the deference federal habeas courts owe to state court results is satisfied here, and federal habeas relief is foreclosed. As Greenspan is not in custody in violation of federal law, the Court should **DENY** the Petition. 28 U.S.C. § 2254(a).

### III.    CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge Anthony J. Battaglia under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court

for the Southern District of California. For all the foregoing reasons, **IT IS RECOMMENDED** that this habeas Petition be **DENIED** in its entirety as the petitioner is not in custody in violation of any federal right, and that petitioner's request for an evidentiary hearing be **DENIED**. **IT IS FURTHER RECOMMENDED** the Court issue an Order (1) approving and adopting this Report and Recommendation and (2) directing that judgment be entered denying the Petition.

IT IS HEREBY ORDERED that no later than **September 24, 2013**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation." **IT IS FURTHER ORDERED** that any Reply to the Objections shall be filed with the Court and served on all parties no later than **October 1, 2013.** The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order. *See* Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

**DATED:** September 4, 2013

_____
**HON. BERNARD G. SKOMAL**
**UNITED STATES MAGISTRATE JUDGE**